Filed 2/3/26  In re J.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.S., <br><br> Defendant and Appellant. | F089201 <br><br> (Super. Ct. No. JJD075344) <br><br> **OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Sara D. Bratsch, Judge.

Candice L. Christensen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Ismah Ahmad, Deputy Attorneys General, for Defendant and Respondent.

-ooOoo-

---

[*]     Before Peña, Acting P. J., De Santos, J. and Harrell, J.

Minor J.S. contends on appeal that the juvenile court's disposition order must be reversed and the matter remanded because the court abused its discretion when it committed him to the short-term program. He further contends the error was prejudicial. The People disagree. We affirm.

**PROCEDURAL SUMMARY**

*December 15, 2023 Juvenile Wardship Petition*

On December 15, 2023, an amended juvenile wardship petition was filed in Tulare County Superior Court pursuant to Welfare and Institutions Code[1] section 602, alleging minor committed a carjacking (Pen. Code, § 215, subd. (a); count 1); unlawfully fled a pursuing peace officer's motor vehicle while driving recklessly (Veh. Code, § 2800.2; count 2); and misdemeanor petty theft (Pen. Code, § 484, subd. (a); count 3). As to count 1, the amended petition further alleged that minor personally used a firearm (Pen. Code, § 667.5, subd. (c)(8)).

On December 20, 2023, the juvenile court held a detention hearing. Minor denied the allegations. The juvenile court ordered minor to be released on electronic monitoring.

On October 23, 2024, the juvenile court held a jurisdiction hearing. The court found true the allegations of the amended petition beyond a reasonable doubt. The court released minor on his own recognizance.

On November 20, 2024, the juvenile court held a disposition hearing. The court committed minor to the short-term program for 180 days on out-of-home placement probation and granted minor 10 days of credit for time served. The court also ordered other terms and conditions of probation.

On January 16, 2025, minor filed a timely notice of appeal.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

2.

# FACTS

On December 1, 2023, Maria T. (Maria) was eating lunch in her car, a gray BMW sedan, while parked in a parking lot, when minor and another male subject knocked on her window and told her to get out of the car. Maria hesitated, but minor then showed her that he had a gun and told her to get out, so she did. Minor and the other subject then left in Maria's BMW. Maria called the police.

Later the same day, police were contacted regarding the theft of five hoodies and five beanies from a gas station convenience store. Tulare Police Officer Hector Negrete watched the store's surveillance video recordings of the incident[2] from inside the store and outside in the parking lot. Negrete testified that "a younger Hispanic male entered the convenience store wearing a gray hoodie" and "took items, not paying for them.… That same subject entered a dark-colored BMW four-door sedan that matched the description of a carjacking vehicle from earlier that day." Negrete testified he was able to identify the subject in the videos as minor, because Negrete grew up in the same community as minor, and that minor was known as "Babyface." Negrete testified that the videos showed minor getting into a car matching the description of Maria's BMW.

Later that day, L.O. and her children were at her son's vigil on the side of a road when a BMW drove by them and crashed into a semi-truck that was parked next to the vigil. The BMW then "flipped around, parked next to them, and an occupant stepped out and started confronting them." One of L.O.'s children noticed that one of the occupants of the BMW was holding a handgun. L.O. fled with her children and flagged down California Highway Patrol (CHP) Officer Manuel Ramos to report the incident. L.O.'s child told Ramos that one of the subjects had a gun with an extended magazine. Ramos went to the vigil and saw it had been destroyed. Ramos testified that, while investigating

---

[2] A video taken by Negrete of the convenience store and gas station's surveillance video recordings of the incident was entered into evidence as Exhibit 1.

the hit-and-run of the semi-truck, he heard CHP dispatch put out a "BOL of a carjacking vehicle which matched the description of the suspect that [L.O.] encountered at the vigil…. It was a dark or gray-colored BMW, newer model. The occupants were two Hispanic males, young, in their twenties, wearing light sweaters, gray sweaters, and a beanie." Ramos confirmed the description of the suspects involved in the crash at the vigil and the carjacking. After completing the investigation of the hit-and-run of the semi-truck, Ramos began traveling northbound from the vigil and noticed a BMW matching the description of "the BOL and the vehicle that crashed into the parked semi-truck." Ramos did a U-turn and attempted to overtake the BMW, but the BMW "rapidly accelerated away" from him and continued southbound. Ramos testified that he caught up with the BMW and got behind it, but the driver of the BMW "immediately pulled the BMW over on the opposite side of the road. So it pulled over facing the wrong direction and activated the hazard lights on the BMW. Realizing that was odd behavior, I got behind it and activated my emergency lights just to let my presence [be] known. Once I activated the lights, the suspect vehicle fled and a pursuit ensued, and it traveled northbound on the … [f]reeway." The pursuit lasted "[r]oughly 30 minutes."

Ramos testified that during the pursuit, minor drove erratically and recklessly on the freeway, including doing a U-turn and driving in the opposite direction of traffic, resulting in a head-on collision with Ramos's patrol vehicle. However, minor continued to flee from Ramos onto surface streets through a town, including residential areas, where Ramos continued to pursue him. At times minor also put his entire upper body out of the car window making gang signs at Ramos and other law enforcement vehicles pursuing him. At one point, minor threw a plastic bag out of the driver's side window into a canal. The plastic bag looked like it contained something heavy. Minor also swerved head-on towards another law enforcement vehicle and ran stop signs, before finally crashing and attempting to flee on foot, at which point Ramos was able to apprehend him.

4.

Ramos identified the driver of the BMW as minor after he was apprehended and identified him in court. Ramos did not find any firearms in the BMW after it was recovered. The plastic bag minor had thrown out the window during the pursuit was never located. Ramos stated the plastic bag looked like it had something inside it.

An hour after minor was apprehended, Maria identified him in an in-field lineup as the subject who was holding the gun and who took her BMW. She did not identify the other subject who was in the BMW. Maria identified minor in court.

## DISCUSSION

Minor contends the juvenile court abused its discretion when it committed him to the short-term program, and that its ruling deprived minor of his rights to a fair hearing and due process of law guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. Minor further contends the error was prejudicial. The People disagree. We agree with the People.

### A. Background

### November 13, 2024 Probation Officer's Report

The November 13, 2024 probation officer's report recommended minor be placed in the mid-term program because minor was affiliated with a gang, lacked remorse for his offenses, had a history of substance abuse, and performed poorly at his independent studies for school. The report stated that "[d]uring the Probation interview, … minor showed no remorse for his actions or the victims. [M]inor denied gang association[.] [H]owever probation records, school records and [minor's] tattoos indicate he is a northern gang member…. [S]chool records indicate [minor] has not been completing nor attending his schoolwork online since September 2, 2024." Therefore, "Probation believes … minor requires a higher level of supervision in a structured setting," such as the mid-term program. It stated the mid-term program would "ensure the minor receives the necessary counseling, ensure he attends school and hold him accountable for negative behavior. The Midterm Program will further provide … minor with ongoing therapeutic

5.

intervention and services including substance abuse treatment, victim impact, anger management counseling, thinking for a change, getting motivated to change, and life skills."

At the disposition hearing, minor's counsel requested the juvenile court place him on "Ward Probation at home with his parents." She argued,

> "[Minor] understands that his actions were unacceptable; however, it was a huge wake-up call for him…. [¶] [S]ince his release he has been doing very well in the home. [Minor's mother] reports he is respectful, he is helpful and he is associating with people who she approves of now. [¶] [Minor] does report that he has been struggling with [a program] at school since it is an online program [because of technical issues]. But he has been turning in paper packets to his teacher. [¶] During his off time from school he is working in the fields. [¶] He does report that he has previously been an associate with the northern gangs. However since his release he has decided to make a change and distances himself from his old life. While he does still have the tattoos he made sure to keep them covered with long sleeve[s] so they do not cause him any problems when he goes out of the house. [¶] And [minor's mother] has reported that he is no longer leaving the house and hanging out with people she doesn't approve of. Instead he only hangs out with his girlfriend, who [minor's mother] believes is a positive influence on his life. [¶] Because he has shown an improvement that he has been out on the monitor, home supervision and finally on own release, we are asking h[e] get one chance at Probation At Home with the understanding that any violations are likely to result in at least a midterm program."

The prosecution submitted on the probation report's recommendation that minor be committed to the mid-term program.

The juvenile court stated it was concerned with the circumstances of the offense, including minor's access to and use of a firearm, its lasting impacts on the victim of the carjacking, as well as minor's poor performance in school, including not logging into his online course since September 2, 2024. The court denied minor's request for Ward Probation, but stated it was going to "compromise with regard to the level of program." It stated, "The Court has read [and] considered the social study prepared by the probation

officer and any other relevant evidence." It committed minor to the short-term program, stating,

> "[Minor] is committed to the short term program for a total of 180 days and is remanded forthwith. Continuance in the home is contrary to [minor's] welfare, with credit for ten days served. [¶] The welfare of [minor] requires that physical custody be removed from the parent or guardian. [Minor]'s parent or guardian has failed or neglected to provide or is incapable of providing proper maintenance, training and education for [minor]. Continuance in the home is contrary to [minor's] welfare. [¶] Reasonable efforts to prevent or eliminate the need for removal have been made."

### B.    Law

Section 202 provides:

> "[M]inors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter." (§ 202, subd. (b).)

In deciding a minor's placement, " 'the juvenile court [has] maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' " (*In re James R.* (2007) 153 Cal.App.4th 413, 432; *In re Carlos J.* (2018) 22 Cal.App.5th 1, 7.) Dispositional orders must conform with the purposes of juvenile delinquency laws, which are "twofold: (1) to serve the 'best interests' of the delinquent ward by providing care, treatment, and guidance to rehabilitate the ward and 'enable him or her to be a law-abiding and productive member of his or her family and the community,' and (2) to 'provide for the protection and safety of the public.' " (*In re Charles G.* (2004) 115 Cal.App.4th 608, 614.) To accomplish these purposes, the juvenile court "has statutory authority to order delinquent wards to receive 'care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances.' " (*Id*. at p. 615, see § 202, subds. (a), (b) & (d).)

7.

When determining the appropriate disposition in a delinquency proceeding, the juvenile courts are required to consider "(1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.) It must "consider 'the broadest range of information' in determining how best to rehabilitate a minor and afford him adequate care." (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329.)

"In all cases in which a minor is adjudged a ward or dependent child of the court, the court may limit the control to be exercised over the ward or dependent child by any parent or guardian and shall, in its order, clearly and specifically set forth all those limitations, but no ward or dependent child shall be taken from the physical custody of a parent or guardian, unless upon the hearing the court finds….: [¶] … [¶] [t]hat the welfare of the minor requires that custody be taken from the minor's parent or guardian." (§ 726, subd. (a)(3).) "When a minor is adjudged a ward of the court on the ground that they are a person described by Section 602, the court … as an additional alternative, may commit the minor to a juvenile home, ranch, camp, or forestry camp." (§ 730, subd. (a)(1).)

A disposition hearing record should reflect evidence that the proposed means of rehabilitation will result in probable benefit to the minor, and that the goals of the juvenile law could not have been met by a less restrictive placement. (*In re Michael D.* (1987) 188 Cal.App.3d 1392; *In re Miguel C.* (2021) 69 Cal.App.5th 899, 906.) "After finding that a minor is a [ward of the court], the court shall hear evidence on the question of the proper disposition to be made of the minor. The court shall receive in evidence the social study of the minor made by the probation officer and any other relevant and material evidence that may be offered, including any written or oral statement offered by the victim …. In any judgment and order of disposition, the court shall state that the social study made by the probation officer has been read and that the social study and any statement has been considered by the court." (§ 706.)

The standard of review in juvenile commitment decisions is abuse of discretion. (*In re Joey G.* (2012) 206 Cal.App.4th 343, 346.)  A custodial commitment is not an abuse of discretion where the record illustrates "both a probable benefit to the minor … and the inappropriateness or ineffectiveness of less restrictive alternatives." (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.)  However, "there is no rule that … a [more restrictive] placement cannot be ordered unless less restrictive placements have been attempted." (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1159.)

A court abuses its discretion when it acts " 'in an arbitrary, capricious or patently absurd manner that result[s] in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125, overruled on other grounds in *People v. Leon* (2020) 8 Cal.5th 831, 848.)  Reviewing courts "must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." (*In re Lorenza M.* (1989) 212 Cal.App.3d 49, 53.)  Unless the record is entirely devoid of evidence to support the court's factual findings, the decision to commit a minor should not be disturbed.  (*Nicole H.*, *supra*, 244 Cal.App.4th at p. 1154.)  " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' " (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  " ' "In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law." ' " (*In re Oscar A.* (2013) 217 Cal.App.4th 750, 756.)  In reviewing a commitment determination, we remember that " 'the primary goal behind maintaining separate courts and procedures for adults and minors is to ensure that juvenile offenders who have not yet become hardened criminals receive treatment and rehabilitation.' " (*In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1542.)  That goal is reflected in the mandate that juvenile courts consider "the protection of the public as well as the rehabilitation of the minor" in reaching a disposition.  (*Ibid.*)  Accordingly, "when we assess the record in light of the

purposes of the Juvenile Court Law [citation], we evaluate the exercise of discretion with punishment and public safety and protection in mind." (*Lorenza M.*, *supra*, 212 Cal.App.3d at p. 58.)

### C. Analysis

Here, the juvenile court did not abuse its discretion when it committed minor to the short-term program. Substantial evidence supports the court's reasonable inference that the short-term program will result in probable benefit to the minor, and that the goals of the juvenile law could not have been met by a less restrictive placement. (See *In re Michael D.*, *supra*, 188 Cal.App.3d at p. 1397.)

The probation report recommended minor be committed to the mid-term program because "Probation believes the minor requires a higher level of supervision in a structured setting," based on minor's gang affiliation, lack of remorse for his offenses, poor performance in his independent studies program, and history of substance abuse. The report stated minor did not express remorse for his conduct and had not rehabilitated outside of custody while awaiting disposition, as he had been marked absent from his independent studies program since September 2, 2024, did not meet the expectations of the program and had numerous behavioral issues while enrolled. The report further stated that although minor stated he was no longer involved with a gang, he had gang tattoos and probation records showed he was affiliated with the Northern gang. The report also noted minor used marijuana. The report listed the programs available in the mid-term program to best address minor's needs, including counseling, required attendance in school, "substance abuse treatment, victim impact, anger management counseling, thinking for a change, getting motivated to change, and life skills."

The juvenile court stated it read and considered the probation report. The court also noted minor "had access to a weapon." It stated that it was denying minor's request for "Ward Probation" because it found "[c]ontinuance in the home is contrary to [minor's] welfare." The court continued, stating it was aware of its discretion to

10.

"compromise with regard to the level of the program," and determined that the short-term program in an out-of-home placement, rather than the mid-term program recommended by the probation report, was most appropriate for minor.

Minor argues that the juvenile court's ruling was an abuse of discretion because there was no showing that minor being home on probation would be inappropriate or ineffective.

However, substantial evidence, including minor's poor performance in the independent study program, shown by his failure to attend the program at all for the three months preceding the disposition hearing, continued marijuana use, denial of gang affiliation, and lack of remorse for his offenses, supports the juvenile court's reasonable inference that the short-term program will result in probable benefit to minor, and that the goals of the juvenile law of rehabilitation of minor and protection of the public could not have been met by the less restrictive placement of in-home probation.

The record shows the court heard evidence on the question of the proper disposition to be made of the minor and received in evidence the probation report, which it read and considered as required by section 706, as well as other relevant and material evidence. The record also shows that the court considered minor's age, previous delinquent history, and the circumstances and gravity of his offenses when it committed him to the short-term program, as required by section 725.5. The disposition hearing record also reflects evidence that minor's commitment to the short-term program will result in probable benefit to minor, as the goals of rehabilitation of minor and protection of the public were not met when he was released to his parents' custody at home while awaiting the disposition of the case, which was shown by his failure to attend his independent studies program, lack of remorse for his offenses, continued marijuana use, and denial of his gang affiliation.

Pursuant to sections 706 and 725.5, and in light of the dual purposes of juvenile law to protect the public and rehabilitate minor, the court's decision to place minor in the

short-term program is supported by sufficient evidence and was neither arbitrary nor capricious.  Accordingly, we conclude the court did not abuse its discretion when it committed minor to the short-term program.[3]

### *Prejudice*

Minor further argues the juvenile court's ruling was prejudicial pursuant to *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) because "[t]here was no basis to commit him to a residential program when he had remained at liberty for nearly a year," and that he "was released from electronic monitoring with the knowledge that charges were pending against him."

As stated above, the court did not abuse its discretion when it committed minor to the short-term program because there is substantial evidence to support its reasonable inference that the short-term program commitment would result in probable benefit to minor, and that the goals of the juvenile law could not have been met by a less restrictive placement.

However, even if error occurred, it was not prejudicial, as sufficient evidence supports the juvenile court's commitment of minor to the short-term program, regardless of whether he remained at liberty without committing new offenses while the charges were pending against him.  Here, minor was released upon the court's true findings at the jurisdiction hearing, despite the prosecution's request that he be taken into custody due to public safety concerns.  However, as discussed above, the evidence amply supports the court's finding that the short-term program would be in minor's best interest and would serve the purposes of juvenile law by rehabilitating him and protecting the public, because while minor did not commit any new offenses while at liberty awaiting the

---

[3] As we conclude the court did not abuse its discretion in committing minor to the short-term program, the court's ruling did not violate minor's rights to a fair hearing and due process of law pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

disposition hearing, the evidence showed he failed to attend his independent studies program at all after September 2, 2024, lacked remorse for the offenses, continued to use marijuana, and denied gang affiliation during that period, sufficiently supporting the court's reasonable inference that he still presented a danger to the public and was in need of rehabilitation at the time of the disposition hearing and that these goals could not be achieved by less restrictive means. Accordingly, based on this record, even if federal error occurred, we conclude the alleged error was harmless beyond a reasonable doubt under *Chapman*.

## **DISPOSITION**

The disposition order is affirmed.